IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 12, 2025 Session

**STATE OF TENNESSEE v. FRANK E. FANKAM**

**Appeal from the Criminal Court for Davidson County**
**No. 2022-B-847      Steve R. Dozier, Judge**

———————————————————

**No. M2024-01841-CCA-R3-CD**

———————————————————

Defendant, Frank E. Fankam, was indicted by a Davidson County Grand Jury for one count of rape. A petit jury convicted Defendant as charged, and the trial court sentenced Defendant to ten years with one year to be served in confinement and nine years to be served on supervised probation. On appeal, Defendant asserts that: 1) it was plain error for the trial court to allow into evidence text messages between Defendant and the victim; 2) the State impermissibly delayed in bringing an indictment against him in order to gain a tactical advantage at trial; 3) the State committed prosecutorial misconduct in its cross-examination of Defendant and during closing argument; 4) the evidence was insufficient to sustain Defendant's conviction; and 5) cumulative error requires reversal. Having reviewed the record and the arguments of the parties, we find no error and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Patrick T. McNally (on appeal); Brent Horst (at trial), Nashville, Tennessee, for the appellant, Frank E. Fankam.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Chicoya Gallman and Brian Ewald, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The victim met Defendant in January, 2019, while they were both attending the Middle Tennessee School of Anesthesia. They became "close friends" over the course of their time in the program. The victim testified that she and Defendant "ma[d]e out" on two occasions that she could remember, but she denied that they ever had consensual sex. The victim testified, "Nothing ever escalated beyond kissing." She said they "remained good friends[,]" and she denied making any statements to Defendant that would have indicated to him she wanted a sexual relationship. The victim was dating someone, and Defendant was engaged. The victim testified that on "a handful" of occasions, they went out with a group of friends and Defendant stayed the night at her apartment and slept in bed with her. She said they "probably cuddl[ed]."

On September 26, 2020, the victim and her friend took an Uber from the victim's apartment to Old Smokey Yee-Haw Brewery to watch a football game. The victim and her friend shared a beer sampler. Later that night, they met up with Defendant at another bar, The Dogwood, where Defendant was with a group of people the victim and her friend did not know. They left The Dogwood and went to the Tin Roof bar, in Franklin. The victim said the bar was "packed." The victim recalled that she had one drink at The Dogwood. She saw Defendant have one drink at The Dogwood and one drink at the Tin Roof. Defendant, the victim, and her friend took an Uber from the Tin Roof to Defendant's vehicle. Defendant "assured" the victim and her friend that he was not intoxicated, and he drove them to the victim's apartment.

Defendant fell asleep on the couch, and the victim went to her bedroom and fell asleep. The victim left her bedroom door open because she had told her friend that she could sleep in bed with her. Later that night, the victim awoke to "the pressure of [Defendant's] whole body on [her] back and [her] face was being smooshed into [her] pillow and [she] felt him penetrating [her vagina with his penis]." The victim testified, "I didn't understand what was happening until I kind of got my bearings and got my voice and I asked him to please stop." Defendant "kept going for a few seconds," and the victim "kept trying to get [the words] out to please stop." Defendant "eventually" stopped. The victim remembered that she had gone to sleep with a tampon inside her and worried that Defendant had "forced it up further" inside her body. She asked Defendant what he had done with her tampon, and Defendant told her he had "ripped it out and thrown it across" her bedroom. The victim found the tampon the next day while cleaning her room. The victim testified that she did not give Defendant consent to penetrate her and that she asked him "[a]t least three to four" times to stop. The victim asked Defendant to leave, and she went to the bathroom. When she returned to the bedroom, Defendant was still there, and she again asked him to leave. Defendant left the bedroom, and the victim closed and locked the door.

The following afternoon, she told her friend what had happened. The victim did not immediately report the incident to police because she "just needed to get through" clinical training at school the next day. Defendant sent her text messages, but she did not respond. He sent her a Snapchat two days after the incident, but she waited to open it until after she finished her assigned clinical because she "knew it was going to be upsetting" and "distracting."

Defendant's text messages and Snapchat messages were introduced without objection as a collective exhibit at trial. The victim testified that screenshots of the messages were a fair and accurate depiction of the exchanges. At 6:34 p.m. on the day after the incident, Defendant sent a text asking if the victim was upset with him. Defendant said, "I feel like you're ignoring me." The victim did not respond to Defendant's text. The next message Defendant sent using Snapchat, and the victim took a photograph of the message on her phone to preserve it. Defendant said he could tell the victim was upset and that he thought at first that "it was the tampon thing[,]" but he suspected it was something "more." Defendant questioned whether he "misread the signs" after their "drunk conversation at the bar[,]" and he acknowledged that they had "shared a bed . . . many[ ]times" but that they had only "ma[d]e[ ] out[.]" Defendant said he "felt comfortable with more, and [he] thought [the victim] also wanted to."

Defendant emphasized that he "definitely didn[']t finish" because he was "too drunk and tired" and assured the victim that he was "clean" and had only had sex with his fiancée. The victim did not respond to that message, and Defendant sent another Snapchat message, stating that he "COMPLETELY misread the signs" and that he "didn't realize [the victim] was asleep[.]" Defendant said it was "foolish" of him to assume she consented to sex. Defendant said he "truly" did not know the victim "was asleep" and that he "thought [she] had woken up when [he] joined [her] in bed." The victim responded, "The fact that I was not reciprocating anything and laying unconscious on my bed should have been a clue that I did not want that. I feel violated and on top of that you physically hurt me." Defendant responded, "How did [I] hurt you, omg!" and asked the victim what "went on the other night[?]" The victim told Defendant that she woke up with him on top of her and "forcing [him]self inside of [her]!"

The victim explained she was hesitant to report the incident because her school program was "a small community[,]" and they were told "to keep your head down and be quiet." She did not want to "cause any waves" or "bring any attention to [her]self." Three days after the incident, she reported the incident to the program director at her school. On the advice of her program director, she visited the emergency room the next day.

Julie Davis, a sexual assault nurse examiner at Nashville General Hospital, examined the victim on September 30, 2020, and made a report of her findings. The victim

reported that she was menstruating at the time of the exam. The victim gave a verbal account of the assault. She stated that she awoke with her pants and underwear off, and Defendant "was forcing his penis in [her] vagina." Nurse Davis observed no physical trauma during her examination of the victim. Nurse Davis explained that an absence of physical trauma is not unusual in rape cases because in most cases, if injuries are present, they are minor and the genital area "heals very rapidly." Nurse Davis collected the underwear the victim was wearing at the time of the assault, which the victim brought to the exam. Nurse Davis also collected two labial swabs, two vaginal swabs, and a buccal swab from the victim as part of a sexual assault kit.

Defendant testified that he was born in Cameroon and moved to the United States when he was sixteen years old. He met the victim during the first week of their first semester. Defendant testified their relationship "became flirtatious very quickly the first time [they] actually hung out." They "bar hopped around Broadway" and then went to the victim's apartment afterward. While at a bar on Broadway, Defendant and the victim were "making out, [they we]re dancing, it was a fun time." Defendant testified they had sex that night. Defendant said that he and the victim were "[v]ery flirty" and "touchy" with each other. He testified, "That was the nature of our relationship."

Defendant's and the victim's sexual relationship was not ongoing, and it was "[a] few semesters after" the first time when they had sex again. In "[f]ull disclosure," he said he was engaged. His fiancée lived in Indiana, and he would "go out [with the victim] and then one thing would lead to another." On September 26, 2020, while they were at the Tin Roof, the victim asked about Defendant's relationship with his fiancée, and Defendant told her they were "struggling." Defendant said he and the victim "joked around" about being in a relationship. When they returned to the victim's apartment, Defendant fell asleep on the couch. He woke up and his back was hurting so he went to the victim's bedroom. He had slept at her apartment "many times[,]" and he "always sle[pt] [i]n her bed with her." Defendant laid down and "spooned" the victim like he had done "many times" before. The victim moved Defendant's hand from her stomach to her breast, and she began "grinding" on his crotch. Defendant became aroused. The victim lifted her hips to allow Defendant to remove her pants and underwear. Defendant recalled that he removed the victim's tampon and "kind of like chucked it" in the direction of a small trash can. He said the victim did not speak, but she "was moaning, like soft moans." They engaged in sexual intercourse, and the victim asked him to stop because she had to use the bathroom. Defendant said that when the victim returned from the bathroom, "the energy shifted." The victim's demeanor had changed, and they had a "small back and forth" exchange about the victim's tampon. Defendant thought the victim was "being emotional[,]" and he returned to the living room to sleep on the couch. Defendant left the next morning before the victim came out of her bedroom.

Defendant did not deny that he wrote the text messages to the victim. Although Defendant did not save all the messages between the victim and him, he believed there was a reply by the victim that was not introduced. He testified, "It's not there. I don't know what you guys did with it."

Elizabeth Wade dated Defendant for several months in 2021. They saw each other several times a week while they were dating. Ms. Wade testified they had sex on the first day they met. Based on her relationship with Defendant, Ms. Wade opined that Defendant "[a]bsolutely [] would not" engage in sexual intercourse without the other partner's clear consent. She described Defendant as "extremely kind [and] gentle[.]"

Kimberly Freeman testified that she had been in a romantic relationship with Defendant for around two years at the time of Defendant's trial. They had a child together, and Ms. Freeman was pregnant with a second child. Ms. Freeman answered "[a]bsolutely not" when asked whether Defendant was the type of man who would engage in non-consensual sex.

Officer Kimberlin Rothwell, of the Metro Nashville Police Department Special Victims Unit, and Steve Turner, an investigator for the District Attorney's Office, both testified that they were unable to locate or contact Defendant. Officer Rothwell attempted to contact Defendant at "a couple of addresses" without success. Officer Rothwell also called the cell phone number for Defendant that the victim had provided, but the outgoing message appeared to belong to a female. Officer Rothwell testified that she did not feel it was necessary to "dump" the victim's phone because it was not the department's general practice to do a phone dump.

Based on all of this evidence, the jury convicted Defendant of rape. Following a sentencing hearing, the trial court imposed a ten-year sentence to be suspended on probation after one year in confinement. Defendant filed a motion for new trial and amended motion for new trial, which the trial court denied. Defendant appeals.

**Analysis**

*Admissibility of Text Messages*

Defendant contends that it was error for the trial court to admit "incomplete" messages Defendant exchanged with the victim and that the messages were not properly authenticated. Defendant argues that because the jury saw "only screenshots of portions and fragments" of the messages between Defendant and the victim, it provided "an inaccurate account of their discussions." The State responds that Defendant has waived consideration of the issue and that he is not entitled to plain error relief.

Defendant acknowledges that he failed to contemporaneously object to the introduction of the messages, and consequently, he is limited to plain error review on appeal. Where, as here, the defendant fails to contemporaneously object to evidence at trial, this Court's review of the issue is limited to the discretionary plain error doctrine. *State v. Enix*, 653 S.W.3d 692, 700-01 (Tenn. 2022). We may only consider an issue as plain error when all five of the following factors are met: a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is necessary to do substantial justice. *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). "[A]ll five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Smith*, 24 S.W.3d at 283. Furthermore, the "plain error must be of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (internal quotation marks and citation omitted).

The State argues that Defendant cannot establish that his failure to object to the admission of the messages at trial was not tactical because he expressly agreed to their admission. Additionally, the State argues Defendant cannot establish that a clear and unequivocal rule of law was breached or that substantial justice requires consideration of the error.

Defendant asserts that "excluding the text messages would have certainly benefited his defense" because the messages presented "an erroneous depiction" of Defendant's communications with the victim. However, Defendant expressly agreed to the admission of the messages, he admitted that he sent the messages, and he testified at length about his intent behind the messages. Defendant explained that when he wrote the messages, he was genuinely perplexed as to what he had done to upset the victim, he believed the victim consented to and participated in the sexual encounter, and he was shocked to learn the victim believed he had raped her. As the State points out, it is entirely possible Defendant chose not to object to the messages in the hopes that the jury would interpret them to his benefit. Defendant has not shown that his failure to object to the messages was not tactical.

While failure to establish any one plain error requirement is fatal to a claim, we also conclude that no clear and unequivocal rule of law was violated by the admission of the messages. Tennessee Rule of Evidence 901(a) provides that evidence is properly authenticated or identified when the proponent introduces evidence sufficient "to support

a finding by the trier of fact that the matter in question is what its proponent claims." Evidence may be authenticated through testimony from a witness with knowledge that a matter is what it is claimed to be. Tenn. R. Evid. 901(b)(1).

The victim testified that the screenshots and photos of the text messages and Snapchat messages introduced at trial were a fair and accurate depiction of the messages between them. She verified the dates and times the messages were sent and explained that the text messages on the left of the screen were sent by Defendant and that she sent the messages on the right of the screen. The victim clarified that she used her iPad to take a photo of the Snapchat messages on her phone because Snapchat alerts a sender when a screenshot is taken and because the messages can disappear. Defense counsel asked Defendant whether he denied sending "any of those messages[,]" and Defendant answered, "No."

Defendant contends that the messages did not "provide[] a complete account of the parties' communications." Defendant points to the following testimony by the victim during direct examination to assert that the State failed to establish the integrity of the evidence:

Q. Now, this message, this next one, which is [Exhibit] 1-G. It looks like the same message, but if you look in the middle starting with, "I feel"[] expli[]tive "about it[.]"[] Why is that message different from this one where it says: "I feel like a massive idiot[?]"[]

A. I'm sorry, what are you asking?

Q. So do you see right here where it says, "I feel like a massive idiot[,]"[] and then right here it says "thinking about it on Sunday[,]"[] right? There is two different messages here. Is it because on Snapchat the first message could have disappeared?

A. Yes.

Q. So this would be the next message, this would be 1-G, right?

A. Yes.

Q. And the next part would start at this part where ["]I feel expli[]tive about it?"

A. Yes.

Defendant characterizes the messages as "fragmented[,]" "cherry-picked[,]" "piecemeal[,]" and "taken out of context." We disagree that the record indicates that the parties' communications were incomplete. Other messages, if any existed, were not needed to ensure a fair and impartial understanding of the proof. Defendant sent several lengthy messages to the victim, in which he expressed his concern for her and denied that he would have engaged in sex without her consent. Defendant also apologized for "misread[ing] the signs" and "assum[ing] it was okay." That the jury by its verdict chose to focus on one portion over another or that its interpretation of the messages did not match Defendant's does not indicate that the messages were not properly authenticated. Defendant has not established the factors required for plain error relief.

*Pre-Indictment Delay*

Defendant contends that the State impermissibly delayed in bringing charges against him, resulting in "the loss of critical evidence that would have provided him with a strong defense." Defendant asserts that the "excessive delay" prejudiced him because he was unaware of the need to preserve messages between the victim and himself, and the State relied upon "piecemeal message threads" to convict him. The State argues that because the victim had alerted Defendant about the possibility of criminal charges against him, he cannot show that the State delayed in charging him to gain a tactical advantage or that he suffered any prejudice as a result of the delay.

In Tennessee, it is well-settled law that "delay between the commission of an offense and the commencement of adversarial proceedings" implicates a defendant's Fifth Amendment due process rights. *State v. Gray*, 917 S.W.2d 668, 671 (Tenn. 1996) (quoting *State v. Dykes*, 803 S.W.2d 250, 255 (Tenn. Crim. App. 1990), *overruled on other grounds as stated in State v. Hooper*, 29 S.W.3d 1, 8 (Tenn. 2000)) (internal quotation marks omitted). The Due Process Clause requires dismissal of an indictment "if it were shown at trial that the pre-indictment delay . . . caused substantial prejudice to the [defendant's] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." *United States v. Marion*, 404 U.S. 307, 324 (1971). Likewise, our supreme court has stated,

> [b]efore an accused is entitled to relief based upon delay between the offense and the initiation of adversarial proceedings, the accused must prove that (a) there was a delay, (b) the accused sustained actual prejudice as a direct and proximate result of the delay, and (c) the State caused the delay in order to gain a tactical advantage over or to harass the accused.

*Dykes*, 803 S.W.2d at 256.

- 8 -

Defendant was indicted on May 18, 2022, approximately twenty months after the offense occurred. The trial court questioned the State at Defendant's bond hearing about the delay between the victim's reporting the incident and the indictment, and the prosecutor responded that it was due to "a crime lab issue" with the DNA analysis. Because the State presented no DNA evidence at trial, Defendant suggests that the State's explanation was "untrue" and that the State used the delay to gain a tactical advantage. Defendant asserts that because of the delay, he did not realize the need to preserve messages from the victim that revealed a pattern of flirting and sexual innuendo.

Of note is Defendant's failure to seek dismissal of the case based on the pre-indictment delay. We also note that a twenty-month delay is not excessive. In any event, Defendant acknowledged at trial that within days of the incident, the victim "essentially" alleged that he "raped her." Defendant testified he was "freaking out" because it was "the Me Too Movement era," and he "d[id]n't know what's going to happen." The nature of those messages between Defendant and the victim should have alerted Defendant to the possibility of criminal charges. Defendant could have preserved any messages that would have assisted his defense when the victim first claimed he raped her. Additionally, the victim and Defendant both admitted at trial that they had a flirty, physical relationship before the incident. Therefore, Defendant has not established that he suffered actual prejudice or that the State caused the delay in order to gain a tactical advantage. Defendant is not entitled to relief on this issue.

*Prosecutorial Misconduct*

Defendant asserts that the State committed prosecutorial misconduct by "repeatedly questioning [Defendant] and commenting on [his] failure to 'defend himself,' leading to improper comments" during its closing argument. Defendant is again limited to plain error review of the issue because he did not object at trial.

Defendant cites the following exchanges during cross-examination when the prosecutor asked why Defendant did not explicitly deny the victim's rape allegation in their text conversations:

Q.    And you didn't say, I didn't rape you? That's not the first thing you wanted to say was, I didn't rape you?

A.    No, it wasn't a[] confrontational type of text. It was more of a -- it seemed to me more of a conversation. This was a friend. Like, it's not a stranger. If it was a stranger, I was like, what are you talking about? But this was a friend, so I'm just continuing -- I'm just explaining. Because in my

head, I'm like, okay, was she more drunk than she thought she was? Was she -- she wasn't asleep, she was responding. So I know that's not true. So I'm not trying to be accusatory. I'm just trying to figure this out at that point.

. . . .

Q. You were in school to get your doctorate in anesthesia, right? . . . And had a lot to lose, right? . . . So you didn't think for one second that, maybe I should defend myself because I didn't rape this lady?

A. I thought -- I honestly thought it was pretty obvious. . . . If she goes with it, someone will come and talk to me, a detective will come and talk to me. I will explain it. It will make sense because it makes sense to me. So I was like putting myself in the shoes of the detective, well, yeah, obviously it makes sense. All of that can happen and you are asleep? No way.

. . . .

Q. And not once in this text thread did you say it didn't happen?

A. I'm pretty sure it's obvious if I'm kissing her and she's kissing me back.

. . . .

Q. At this point there is no need to defend yourself when you have a lot to lose?

A. I didn't say that. I said there is no need to[] fight her.

. . . .

Q. You didn't see the value in defending yourself when she accused you of rape?

A. She didn't accuse me of rape. She said she was asleep. And I said: You were kissing me back.

Q. If she said she was asleep, she's saying that she didn't give consent, that's rape. And you didn't think to defend yourself?

- 10 -

Considering the plain error factors, it is not obvious that Defendant did not waive the issue for tactical reasons. Defense counsel's failure to object to this questioning by the prosecutor could have been a strategic decision to allow Defendant to explain what he believed were appropriate and reasonable responses to the victim's allegation in hopes that the jury would agree.

Additionally, we cannot conclude that the prosecutor's cross-examination violated any clear and unequivocal rule of law. Defendant asserts that the prosecutor referred to facts outside the evidence when he mentioned the impact an allegation of rape would have on Defendant's seeking a professional degree, yet the victim and Defendant met while in school and both testified about their school and program of study. Defendant argues that it is the duty of the trial court to prevent repetitive and potentially harassing questioning by the prosecutor; however, where no objection was made, as in this case, the trial court is not alerted to a potential error. The propriety, scope, manner, and control of the cross-examination of witnesses rests within the sound discretion of the trial court. *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995) (citing *Coffee v. State*, 216 S.W.2d 702, 703 (1948), and *Davis v. State*, 212 S.W.2d 374, 375 (1948)). The State's cross-examination of Defendant did not violate a clear and unequivocal rule of law. Thus, Defendant is not entitled to plain error relief.

Defendant also asserts that the State "built on the improper prejudicial effect of the improper questioning by repeatedly referring to [Defendant]'s failure to defend himself during summations." During closing argument, the prosecutor, referring to text messages between Defendant and the victim, stated:

> I submit to you that it's not like text messages that [Defendant] sent at this time that denied he raped [the victim]. You will find in these messages no such denial.
>
> . . . .
>
> I submit that you should review all of these text messages, look in there, find some hint of what [Defendant] testified about here today. Something that resembles a denial. Something that resembles him sticking up for himself.
>
> . . . .
>
> If he did not rape her, he should have denied it. He did not.

The State may commit prosecutorial misconduct during closing arguments by: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may

draw; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003). In determining whether an improper argument by the prosecutor affected the verdict to the prejudice of the defendant, the following factors must be considered:

> (1) The conduct complained of viewed in context and in light of the facts and circumstances of the case. (2) The curative measures undertaken by the court and the prosecution. (3) The intent of the prosecutor in making the improper statement. (4) The cumulative effect of the improper conduct and any other errors in the record. (5) The relative strength or weakness of the case.

*State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008); *see also Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

Defendant argues that the State "compounded the improper prejudicial effect" of its cross-examination of Defendant by repeatedly commenting on Defendant's failure to explicitly deny the victim's claims during the State's closing argument. Defendant generally asserts that "[t]he State's arguments were improper and contrary to the evidence." Plain error relief requires that a clear and unequivocal rule of law has been breached. The statements by the prosecutor about which Defendant complains do not constitute a misstatement of the evidence or references to facts outside the proof. Both parties "are permitted generous leeway to argue their cases and attempt to persuade the jury during closing argument, so long as they do not step outside the metes and bounds of the proof[.]" *State v. Hall*, No. E2024-01753-CCA-R3-CD, 2025 WL 2398412, at *9 (Tenn. Crim. App. Aug. 19, 2025) (citation omitted), *perm. app. pending*. We conclude that the State's closing argument was not improper, and therefore, Defendant has not established that a clear and unequivocal rule of law was breached. Defendant is not entitled to plain error relief.

*Sufficiency of the Evidence*

Defendant contends that the evidence was insufficient to sustain his conviction for rape. He argues the State failed to establish that he knew or had reason to know that the victim did not consent to sexual penetration. The State responds that the matter of consent is a jury question, and the jury rejected Defendant's theory, as was its prerogative. We agree with the State.

- 12 -

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

As applicable in this case, rape is the "unlawful sexual penetration of a victim by the defendant," if either the "sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent." T.C.A. § 39-13-503(a)(1). The term "sexual penetration" means "sexual intercourse . . . or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's . . . body." *Id*. § 39-13-501(7).

Here, the evidence is sufficient to support Defendant's conviction. Viewed in the light most favorable to the State, Defendant got into bed with the sleeping victim, removed her clothing and tampon, and penetrated her vagina with his penis without her consent. Defendant argues that the victim's "physical actions, coupled with the parties' sexual history, strongly indicated that she consented to penetration." The victim acknowledged that her relationship with Defendant had been flirtatious and physical; however, she denied that they had ever had sex. The victim testified that she went to bed alone and awoke to the pressure of Defendant's body on top of her. She asked Defendant several times to stop and to leave the apartment. This evidence is sufficient for the jury to find Defendant guilty of rape. *See State v. Dreaden*, No. M2024-00429-CCA-R3-CD, 2025 WL 1588019, at *10 (Tenn. Crim. App. Mar. 11, 2025) (concluding the evidence was sufficient for rape conviction where Defendant penetrated the victim while the victim was sleeping), *no perm. app. filed*. Consent is a question for the jury. *State v. Burgin*, 668 S.W.2d 668 (Tenn. Crim. App. 1984). The jury, by its verdict, resolved this matter in favor of the State's theory and rejected Defendant's theory. Defendant is not entitled to relief.

*Cumulative Error*

Finally, Defendant argues that cumulative error warrants reversal in this case. The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To warrant review under the cumulative error doctrine, there must have been more than one actual error during the trial proceedings. *Id*. at 77. In other words, only where there are multiple deficiencies does this Court determine whether they were cumulatively prejudicial. In this case, because we have not found any errors, cumulative error review is unwarranted. Defendant is not entitled to relief.

CONCLUSION

Based on the foregoing and the record as a whole, the judgment of the criminal court is affirmed.

_S/Timothy L. Easter_
TIMOTHY L. EASTER, JUDGE